Laurie Parke

15921 Green Cove Boulevard

Clermont, FL.  34714

Tel: 407-963-6536

Email:  coffeeteame@outlook.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF FLORIDA

## ORLANDO DIVISION

| | |
|---|---|
| LAURIE PARKE,<br>Plaintiff,<br>v.<br><br>DELTA AIR LINES INC.,<br>TONIE TOBIAS, (A.K.A. TOBY<br>TOBIAS), ALEXANDER SINGER,<br>MARIA WHEATON, MALIK<br>LOCKHART, JENNIFER BIYOGUE,<br>J. PATRICK GARRETT,<br>Defendant, | Case No.<br><br>COMPLAINT AND<br>JURY DEMAND |

COMES NOW, Plaintiff Pro Se, Laurie Parke, a former flight attendant for Delta Air Lines Inc., (DAL) and files this complaint against her former employer DAL; Tonie Tobias, (a.k.a. Toby Tobias) Incident Management/Information Technology; Alexander Singer, In-

Complaint                                      1

Flight Supervisor; Maria Wheaton, Supervisor Customer Service; Malik Lockhart, Customer Service Agent; Jennifer Biyogue, Base Manager; and J. Partick Garrett, In-flight supervisor, Defendants.

1. This dispute arises out of the Defendants' retaliatory actions following the implementation of a so called "mandatory" health-related policy (Policy). The Policy ran in contravention to safety rules and regulations promogulated by the FAA and in contradiction to historical safety-oriented policies and expectations detailed in DAL employee handbooks and manuals.

2. The Policy forced the Plaintiff to restrict her breathing for long hours and coerced her, under threat of disparate treatment, to accept an experimental medical treatment with manufacturer advertised serious long term health risks[1]. DAL incentivized the uptake of the drugs, penalized the employees who rejected the offer and under threat of disparate treatment, subjected the Plaintiff to coercive measures and unsafe work environment.

3. Ultimately, for rejecting DAL's offer and engaging in protected and legal activity under The Equal Employment Opportunity Commission (EEOC), the Wendell H. Ford Aviation Investment and Reform Act, known as the AIR 21 and similarly applicable state law, The Florida's Whistleblower Act, and for becoming a member of a class action lawsuit against the CDC, the Plaintiff became a target of a coordinated retaliatory action resulting in her wrongful termination. The Defendants retaliated against the Plaintiff for her participation in protected activities which subsequently resulted in the termination of an otherwise impeccable 24-year career as a flight attendant at DAL.

## VENUE AND JURISDICTION

4. The action complained of arose in Orange County, Florida within the Middle District of Florida. 28 U.S.C. §1391(b)(2) in that a substantial part of the events or omissions

---

[1] Manufacturers advertised serious health risk include Myocarditis, Pericarditis, and blood clotting. None of which were evaluated for cancer causing ingredients.

Complaint                                                    2

giving rise to the claim occurred in this district. Delta Air Lines Inc. is registered to do business in Florida. Jurisdiction over the Plaintiff's claims arises under Federal Jurisdiction 28 U.S.C. § 1331.

5. PLAINTIFF is an individual who resides in CLERMONT, FLORIDA. Plaintiff was a diligent, dedicated, hardworking, loyal Delta employee for 24 years. She had an impeccable record and was never disciplined for her conduct during her employment.

6. Upon information and belief, DELTA AIR LINES INC. is a corporation that is incorporated in DELEWARE and has its principal place of business in ATLANTA, GEORGIA. Other DEFENDANTS: Tonie Tobias, Alexander Singer, Maria Wheaton, Malik Lockhart, Jennifer Biyogue and J. Patrick Garrett, are all employees of DELTA AIR LINES INC. in various capacities having decision making authority and were a direct party to the retaliation of Plaintiff.

## HISTORICAL AND FACTUAL BACKGROUND

7. In April 2020 Delta Air Lines began its enforcement of the mask mandate. Following the mask order, the Transportation Security Administration (TSA) issued a Security Directive (SD) for the transportation sector. The SD targeted airport and aircraft operators and included several exemptions, one of which is relevant in this case, resided in paragraph F3 of the document and was applicable to persons in the Plaintiff's capacity. F3 exempted *"People for whom wearing a mask would create a risk to the workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulation."* DAL continued the enforcement of masking for flight attendants.

8. Sometime in August/September 2020, Delta implemented an app for in-flight employees to use answering questions about symptoms of Covid-19. If you answered "NO" to all questions, you received a green check mark stating, "you are cleared for work'. This was to be completed each day prior to starting your shift.

9. In December 2020 the first Covid vaccines came out. In January of 2021, Delta Air Lines began actively incentivizing (coercing) employees to get vaccine and report their status.

Complaint                                    3

June and July of 2021 Delta held a discriminatory raffle for vaccinated employees to win 1 of 4 prizes of $25,000 each month if you had gotten at least 1 vaccine in those 2 months.

10. In September of 2021 in a town hall meeting companywide Ed Bastian, DAL CEO made the announcement, "There will be no raises for any of our employees until we get a 100% vaccination rate at DAL." He also very bluntly stated "this is for the unvaccinated, I don't want to scare you, but some of you are going to die."

11. In September 2021 DAL engaged in discriminatory behavior by 1) Charging unvaccinated employees, a healthcare surcharge 2) Not pay protecting the unvaccinated if they got sick 3) Forced weekly testing on unvaccinated and badgered them with continuous reminders. September 2021 Delta HR issued forms for religious/medical surcharge waivers as well as vaccine waivers. DAL violated their own policies by allowing and sustaining threatening posts against unvaccinated employees on their internal social media platform.

12. On October 27, 2021, I submitted my medical waiver as well as my covid surcharge waiver. These forms were submitted to HR thru the website portal as well as the signed and faxed form from my physician submitted directly to the number listed on the forms stating my genetic disability and doctors' advice against receiving the covid vaccine based on personal family history and genetics. November 15, 2021, the first healthcare surcharge was taken out of my paycheck and would continue until March of 2022.

13. January 6, 2022, I filed a charge of discrimination based on my genetic history against the vaccine and the discriminatory actions DAL was taking against the unvaccinated employees. I cited that Delta was violating my rights under the ADA and GINA through my EEOC claim. My GINA claim was my genetic family history of strokes, blood clots and heart attacks supported by my physician to not receive the Covid-19 vaccine for health and safety reasons.

14. On March 11, 2022, DAL submitted their position statement in reply to the EEOC complaint and makes verifiably false claims. On March 23, 2022, I filed a lawsuit with 8 other flight attendants from various airlines against The Centers for Disease Control (CDC) in

Complaint                                          4

Denver, Colorado citing the safety risks of wearing the masks onboard the aircraft for prolonged periods of time and at high altitudes.  Trocano et al v. Centers for Disease and Prevention in the U.S. District of Colorado.

15. Plaintiff alleges DAL retaliated against Plaintiff for filing an EEOC complaint.  The individual defendants tortiously interfered with plaintiffs' business relationship with DAL as an employee under Florida law.

### RETALIATORY ACTIONS BY DEFENDANTS

16.  On April 17, 2022, I began a 2-day trip and headed to Boston for a layover. The next morning on April 18, 2022, A Federal Judge in Tampa, Florida declared the mask mandates were no longer in effect at 10:00 a.m. My crew and I were picked up from the hotel and taken to Boston Logan International to work a flight from Boston to Detroit at 5:00 p.m.

17. The genesis of the adverse action was an incident that transpired during the boarding process on Delta flight 709 from Boston, Massachusetts to Detroit, Michigan on April 18, 2022.

18. The aircraft arrived late, and we rushed to board.  After doing my safety checks, I noticed an unidentified person on the aircraft sitting in a passenger seat. I approached the individual and noticed Malik Lockhart (Customer Service Agent) seemingly dressed in a ramp agents' uniform.  This is highly unusual for this person's uniform indicating he was a ramp agent, to be on the aircraft in flagrant violation of multiple safety and security protocols.

19. I advised Malik Lockhart that passenger boarding would begin shortly, and he slowly made his way to the front of the aircraft.

20. The boarding process had commenced, and Malik Lockhart remained on the aircraft positioning himself in the entrance of the cockpit, facing passengers as they boarded.

21. This practice has never happened at Delta in my 24 years of working for DAL.

22. I began my duties welcoming passengers, making appropriate announcements, and watching the cabin for any safety issues. After a while I inquired to Malik Lockhart what he was doing there and that he was in my way, interfering with my crew duties. He was in violation of FAR Rule 14CFR 91.11. (Interfering with crew members during a critical phase of flight).

23. Malik Lockhart immediately left the aircraft through the boarding door without a word.

24. Moments later he returned and took a position in my galley workspace to my left. Again, these actions were highly unusual and suspicious, and something I have never encountered in my 24 years of flying.

25. Another few moments passed, and again he exited the aircraft without any form of communication.

26. As the boarding commenced, I noticed Alexander Singer (an in-flight supervisor) and Maria Wheaton (Customer Service Supervisor-Red Coat) peering over the last passengers obviously trying to observe some expected behavior or item.

27. Moments later Alexander Singer and Maria Wheaton were standing directly in front of me on board the aircraft and began to aggressively accuse me of holding up a photo. I calmly denied their accusations and showed them I had a bag of sanitary wipes that we pass out to the passengers.

28. Again, Alexander Singer accused me of holding up a photo in an aggressive and accusatory tone, violating my personal space, as well as FAR Rule 14 CFR 91.11.

29. When asked what he was referring to, Alexander Singer pulled up a photo on his personal device and accused me again. He showed me a photo of two airline employees promoting not wearing masks on April 18. I never displayed any such photo to any passengers at any time ever.

30. There was no such photo being held up for anyone to see, and it is questionable as to how Alexader Singer acquired such a photo.

31.  Delta Air Lines fabricated a scenario perpetuated by other Delta employees.  Tonie Tobias (a.k.a. Toby Tobias) whose job title at Delta Air Lines is Incident Management and Information Technology through a social media platform, and deliberately set in motion these actions that were unfounded.

32.  Tonie Tobias (a.k.a. Toby Tobias) inserted herself into a private Telegram thread posing as a pilot or flight attendant with intent to seek out individuals that worked for Delta Air Lines and cause undue harm.

33.  At 5:30 p.m. on April 18, 2022, she posted the incident moments after it had happened on that same Telegram thread.  There is no conceivable way that this person had any knowledge of the events that were taking place on my aircraft unless they were somehow involved.

34.  This action speaks volumes as to what exactly Delta Air Lines' intent was.

35.  Shortly thereafter, having failed to see the picture they expected to see me holding, Maria Wheaton (Supervisor-Red Coat), began aggressively asking me where my mask was.

36.  I politely sited the Transportation Security Administration Security Directive SD 1542-21-01C, Section F3. This SD exempts the following categories of persons from wearing masks." People for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations."

37.  Furthermore, I briefly explained Federal Aviation Administration regulation 14CFR§ 121.417 crewmember emergency training, (ii) section (E) crewmembers who serve in operations above 25,000 feet must receive instruction in the following: Respiration, Hypoxia, Duration of consciousness without supplemental oxygen at altitude.  This training was never tailored to include the mask and therefore not properly received by crew members.

38.  Disregarding what I had to say, Supervisor Marie Wheaton then said she was going to talk to the captain.  Moments later she returned from the cockpit and told me they were going to remove all the passengers.

Complaint                                                7

39. I asked her, "Why is there a mechanical issue with the aircraft?" She stated "No, it is because you won't wear a mask."

40. I professionally guided Alexander Singer and Marie Wheaton onto the jet bridge out of the purview of the passengers, took the mask offered by Alexander Singer, and complied with his request.

41. I closed the boarding door, and we were ready for a pushback from the gate.

42. Moments after playing the safety video I was called on the interphone by the captain and told we were going back to the gate. Delta security was involved, and I was being removed from the flight.

43. After our brief return I was then told by the captain, "they are letting you go because there isn't anyone here to replace you."

44. Again, we taxied out and took off for our destination of Detroit.

45. Prior to our landing in Detroit, Delta Air Lines followed suit along with all the other air carriers and dropped their mask policy.

46. I opened the aircraft door and met with two supervisors of in-flight at the end of the jet bridge. After all passengers excited the aircraft and my final safety checks were complete, I exited the aircraft.

47. The supervisors wanted to know what took place in Boston only a couple of hours earlier. I explained the same as above and was told I was being removed from the rest of my trip.

48. I headed to the gate and took the flight I was supposed to be working home as a passenger.

49. J. Patrick Garrett, my in-flight supervisor in Orlando immediately upon landing in Detroit, asked me to write a report on the events that took place that evening.

50. I arrived back in Orlando around 11:30 p.m.

Complaint                                    8

51. The following morning J. Patrick Garrett again asked for my report of the events from the night before. He stated that Jennifer Biyogue (Orlando Base Manager In-flight) needed it by 12:00 noon that day.

52. I stated that I needed time to do the report. I had family to take care of.

53. Again, he asked that I file a report by 12:00 noon the next day per Jennifer Biyogue.

54. I filed my report within 3 days of the trip ending and went to work for another trip.

55. In the middle of this trip, I was told by J. Patrick Garrett that he had some questions for me and wanted me to call him. I replied to his text and asked him to send me the questions and I would get back with him at the end of this trip.

54. The next afternoon J. Patrick Garrett reached out to me via phone call and asked me a litany of questions.

55. I had 4 days off before my next scheduled trip.

56. I was called the day before my next trip April 27, 2022, and asked to come in for a meeting the following morning at 11:00 a.m.

57. April 28, 2022, I arrived at Orlando International Airport for my meeting and was denied access through the Known Crewmember Lane. My employee ID no longer seemed to work.

58. I texted J. Patrick Garrett and asked him if they had done something to my statis because I could not come through. Despite having access to, and the ability to change my status, he plead ignorance and came to escort me to the meeting on the other side of security.

59. Once downstairs I was led to a room where Jennifer Biyogue and J. Patrick Garrett and I were seated for the meeting.

60. I was told I was not allowed to record this meeting. I was also not afforded any representation or to have a witness on my behalf of what would transpire during the meeting.

61. They falsely accused me of multiple actions and conduct associated with the Boston flight.

62. I reiterated my safety concerns to them in accordance with company policy, FARs and the TSA SD, and they summarily and abruptly dismissed my concerns.

63. The meeting concluded with a 30-day unpaid suspension during their investigation. I was presumed guilty of their false accusations before I was provided any chance to defend myself, or any formal investigation was conducted. My fate was predetermined before I even made it to the meeting based on the change in employee status and the fact, they had the letter ready to hand me at the conclusion of the meeting.

64. I was not given a copy of the questions/accusations they talked about in the meeting. When asked if I could have a copy Jennifer Biyogue said, "No, we don't do that."

65. I left the meeting and within two weeks was sent a termination letter on May 15, 2022.

66. The termination letter simply stated I was terminated for reasons discussed in the meeting.

67. May 26, 2022, again I was asked to reply by 5:00 p.m. if I wanted to be terminated, quit, or retire. Again, I chose none.

68. June 5, 2022, again I was asked to reply by 5:00 p.m. another chance to choose to be terminated, quit or retire. I chose none.

69. Delta violated its own "Way We Fly" handbook of rules each Delta employee is obligated to adhere to as an employee of their company. Delta states that we must come to work **fit for duty.** When we come to work, we must acknowledge that we are adequately rested, physically and mentally able to do our jobs. That we will be alert and attentive in performing our duties SAFELY. In fact, 14 Code of Federal Regulations (CFR) Section 117.3 defines **Fit for Duty** as, "physiologically and mentally prepared and capable of performing assigned duties at the highest degree of safety." It appears that Delta's policy is written in accordance with the **Federal Regulations,** nearly verbatim.

70. I am responsible for practicing safe work habits and protecting myself and all the individuals I encounter when I am performing my duties. The mask does not allow for any of

those things to be possible. It creates headaches, fatigue, bloody noses, and dizziness for those of us flying at 35,000 feet every day, wearing masks for 10-14 hours a day. Another company violation is the absence of training in accordance with 14 CFR 121.417_Crewmember emergency training. Flight crews **never** received any specific training while wearing the mask and performing our duties in an emergency, and yet, we are required to wear a mask for the simple reason Delta mandates it. Furthermore, FAA Safety Alert for Operators (SAFO) 20009 specifically says on page 3, "Air carriers should complete a safety risk assessment and provide guidance to their crewmembers on procedures for the use of masks as they may affect the donning of oxygen masks or conducting other safety functions on the flight deck or in the cabin." During my training, I was never informed of any such safety risk assessment nor provided guidance on procedures for the use of masks.

71. On August 11, 2023, I received my right to sue letter from the EEOC. The right to sue letter is attached here to as Exhibit A.

72. The right to sue letter gives me the right to sue Delta Air Lines for their clearly perceived disability and GINA discrimination against me during the period of Covid overreaction and coercion perpetuated by our government and major corporations.

73. Delta Air Lines should be held accountable for allowing threats to be made to unvaccinated employees via a company social media platform.

74. Delta Air Lines violated my Constitutional rights in accordance with the 14th Amendment.

75. Delta Air Lines rationale in firing me is "not an accurate or complete explanation of the company's termination decision.

### LAW AND ADDITIONAL FACTUAL CLAIMS

76. Title I of the ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to...employee compensation...and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The elements of a claim under the ADA are

that: (1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) I was otherwise qualified to perform the essential functions of the job with or without reasonable accommodations; (4) I suffered an adverse employment action; and (5) the adverse action was imposed because of my disability (perceived or actual). A plaintiff must show that the adverse employment action "took place under circumstances giving rise to an inference of discrimination."

77. Once a plaintiff produces minimal evidentiary support for the claim of discriminatory motivation, the burden of production shifts to the employer to articulate a non-discriminatory reason for the adverse action. [A] Title VII plaintiff can prevail by proving that an impermissible factor was a "motivating factor," without proving that the employer's proffered explanation was not some part of the employer's motivation." Also, the Federal Aviation Administration sites 14 CFR 121.417 crewmember emergency training, (ii) section (E) crewmembers who serve in operations above 25,000 feet must receive instruction in the following: Respiration, Hypoxia, Duration of consciousness without supplemental oxygen at altitude. In which this training was never received by crew members nation was not some part of the employer's motivation."

78. Moreover, under both the ADA and Florida's Private Whistleblower Act, an employee is prohibited from taking "retaliatory personal action" against an employee who discloses his or her employer's activity, practice or policy that violates a law, rule, or regulation. To stats a retaliation claim, an employee "must show that he/she engaged in a protected activity, that he/she suffered an adverse employment action, and that a causal connection exists between the protected activity and the adverse employment action." [A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action."

79. It is undisputed that Delta Air Lines Inc., falls within the purview of the ADA and Florida's Private Whistleblower Act, and it is equally unquestionable that Delta took adverse

Complaint                                      12

employment action by suspending me for 30 days without pay and then terminating my employment within two weeks.    My allegations of discrimination-particularly the mismanagement of my accommodation requests- and the timing of Delta's adverse employment action, collectively, gives rise to a presumption of discriminatory or/and retaliatory motive for same. Accordingly, the burden shifts to Delta to demonstrate a legitimate nondiscriminatory reason for the adverse employment action.    The conclusory, contradictory, and downright flimsy denials set forth in Delta's position statement to my EEOC claim clearly fall well short of meeting this burden. In fact, my spotless record of employment with Delta spanning twenty-four years, belies any plausible contention that I was unqualified to perform my duties. Indeed, Delta's decision to allow me to remain onboard and work the flight from Boston to Detroit on April 18,2022, and to continue to work another trip just days later, speaks volumes about Delta's motives here.

80. There can be no reasonable doubt that Delta engaged in a pattern of discriminatory treatment towards myself based upon a perceived disability (i.e., my unvaccinated status), for the purpose of coercing my compliance with a political and financial agenda (to "promote" vaccination). Despite Delta's denying that employees were required to submit to COVID-19 vaccination as a condition of continued employment, Delta concedes that it "implemented a number of measures to encourage employees to receive the COVID-19 vaccine and...required those who were unvaccinated to wear a masks and test weekly." Delta further admits that its efforts included a healthcare surcharge and denial of COVID-19 pay protection programs for unvaccinated employees (hereinafter, these discriminatory policies are referred to collectively as, the "COVID-19 Protocols.") And even if Delta-as further alleged in their statement-did not publish a formal, written policy overtly requiring employees to disclose their vaccination status, logically, such disclosures was necessarily required to enforce the COVID-19 Protocols, as is demonstrated in a series of harassing emails sent weekly to unvaccinated employees. Moreover, the COVID-19 Protocols-which Delta frames as "mitigation efforts" or/and

promoting vaccination-is the unlawful, discriminatory treatment which forms the subject of the Charge. Indeed, these discriminatory policies, collectively, amounted to a de facto vaccine mandate under which unvaccinated employees were penalized for daring to assert their legally protected rights. My refusal to submit to continued discrimination is what ultimately motivated Delat to take the adverse employment action. When it became clear to Delta how I felt about their Covid policies, Delta set in motion a fabricated story and tried to incriminate me onboard my aircraft while I was working. In clear violation of FAR 14 CFR 91.11 interfering with a crewmember during a critical phase of flight. When it became clear to Delta that I objected to their unlawful policies I was terminated. Delta must now be held accountable for its unlawful actions.

## CLAIMS FOR RELEIF

**COUNT I:** Violation of the ADA (Against DAL)

81. Plaintiff incorporates paragraphs 1-80 herein.

82. DAL was covered by the ADA

83. Plaintiff was perceived to be disabled by her employer as a result of her genetic and family history resulting in vulnerability to the Covid-19 vaccine.

84. Plaintiff was qualified to perform the job because she had done so for years without incident.

85. Plaintiff suffered an adverse employment action when she was accused of an action that was never founded.

86. These adverse consequences were imposed as a result of Plaintiffs perceived disability.

**COUNT II:** ADA Retaliation (Against DAL)

87. Plaintiff incorporates paragraphs 1-80 herein.

Complaint                                        14

88.  Plaintiff engaged in a protected activity by filing an EEOC claim alleging discrimination.

89.  DAL took an adverse action against Plaintiff for filing an EEOC claim under the ADA and retaliated against her in the workplace.

**COUNT III**: Violation of GINA (Against DAL)

90.  Plaintiff incorporates paragraphs 1-80 herein.

91.  Plaintiff was perceived to be disabled by her employer as a result of her genetic family history of strokes, blood clots and heart attacks resulting in her vulnerability to the Covid-19 vaccine.

92.  Plaintiff was qualified to perform the job duties because she had done so for 24 years without incident.

93.  Plaintiff suffered an adverse action when DAL and other employees made false accusations against her.

94.  These adverse actions were imposed as a result of Plaintiffs perceived GINA disability.

**COUNT IV**: GINA retaliation (Against DAL)

95.  Plaintiff incorporates paragraphs 1-80 herein.

96.  Plaintiff engaged in a protected activity by filing an EEOC complaint for GINA discrimination.

97.  DAL took an adverse action against Plaintiff by using false claims and actions by other employees towards Plaintiff.

98.  The adverse actions by DAL resulted in termination of Plaintiff for participating in a protected activity in her EEOC claim.

99.  Plaintiff is protected by GINA because she had her genetic disabilities stated by her physician in support of her EEOC discrimination claim.

100.  Plaintiff was qualified to perform her job duties for 24 years without incident. The employer favored other employees and discriminated against Plaintiff.

Complaint                                         15

**COUNT V:**  Florida Whistleblowers Act Violation

101.  Plaintiff engaged in a statutorily protected activity under the FWA Act by filing an EEOC complaint and an AIR 21 lawsuit.

102.  Plaintiff suffered an adverse employment action by being watched on private social media, and had false accusations made in the workplace.  The plaintiff was targeted by employer and unfounded claims were made against her.

103.  Plaintiff has suffered damages as a result of retaliation and adverse employer actions.

**Count VI**: Florida Law Tortious Interference with Employment Relationship.

104.  Plaintiff had a business relationship with DAL because she was an employee for 24 years. All indicated defendants were colleagues and coworkers of Plaintiff.

105.  The intentional interference by defendants to disrupt the employee relationship with Plaintiff because it resulted in termination of Plaintiff.

106.  Plaintiff has suffered damages as a result of the damage placed upon her by DAL and other defendants.  All defendants were participants in the destruction of the relationship between Plaintiff and DAL.

### PRAYER FOR RELIEF AND REMEDY

**WHEREFORE,** PLAINTIFF seeks all available compensatory damages and punitive damages, as well as costs.  And all other damages that are proper and all other relief the court deems just under Florida and Federal law, including but not limited to:

Delta Airlines reinstate Plaintiff to flight status and make her whole.

Complaint                                           16

Expunge the Plaintiff's employee file of any reference to insubordination or violation of any company policy.

Return employees 8 positive space award tickets.

Award Plaintiff compensatory damages in the amount of $250,000.00 plus 0.6 per cent (6%) or higher with passage of time. Pay for the last 2 years, health, dental, and vision insurance for employee and child, profit sharing, 401k contributions, and 50 hours of PPT earned that was not paid out properly. Also 8 weeks of vacation time and over 100 hours of earned PPT time.

Award Plaintiff punitive damages of $10.300.000,00 or higher amounts as the court sees fit.

Award Plaintiff reasonable costs and attorney fees, if retained, pursuant to 42 U.S. Code § 1988; and,

Grant Plaintiff other and further legal and equitable relief as the Court deems just and proper.

## **JURY DEMAND**

NOW COME Plaintiff, Pro Se, and hereby demands trial by Jury of the above-referenced causes of action.

Dated this 08th<sup>th</sup> day of November 2023.

Laurie Parke

Laurie Parke

15921 Green Cove Boulevard

Clermont, FL.  34714

Tel: 407-963-6536

Email:  coffeeteame@outlook.com

**Pro se,** Prepared with assistance of counsel.

Complaint                                                    18